## CASE NO. 24-13547

# IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## FOR THE ELEVENTH CIRCUIT

AFRICAN PEOPLE'S EDUCATION AND DEFENSE FUND, INC.,
*Plaintiff-Appellant,*

v.

PINELLAS COUNTY,
*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA 8:23-CV-2395-TPB-AAS

## OPENING BRIEF OF APPELLANT

Luke Lirot, Esq.
LUKE CHARLES LIROT, P.A.
Florida Bar Number 714836
2240 Belleair Road, Suite 190
Clearwater, Florida 33764
(727) 536-2100
Luke2@lirotlaw.com
team@lirotlaw.com
*Counsel for Appellant*

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1, Plaintiffs-Appellants

certify the following is a complete list of interested persons:

1. Daniel Lawrence Abbott, Esq. – Counsel for Appellee.

2. African Peoples Education and Defense Fund, Inc., A 501(c)(3) Florida Not for Profit Corporation – Appellant.

3. Dave Eggers - Pinellas County Board of County Commissioners Member.

4. Anne Reilly Flanigan, Esq. – Counsel for the Appellee .

5. René Flowers - Pinellas County Board of County Commissioners Member.

6. Charlie Justice - Pinellas County Board of County Commissioners Member.

7. Chris Latvala - Pinellas County Board of County Commissioners Member.

8. Luke Lirot, Esq. – Counsel for Appellant.

9. Janet Long – Pinellas County Board of County Commissioners Chair.

10. Chris Nowicki - new Pinellas County Board of County Commissioners Member

11. Kathleen Peters - Pinellas County Board of County Commissioners Vice Chair.

12. Pinellas County Board of County Commissioners – Appellee.

13. Rachel Ricks – Counsel for Appellant.

ii

14. Chris Scherer – new Pinellas County Board of County Commissioners Member.

15. Brian Scott – Pinellas County Board of County Commissioners Member.

16. Laura K. Wendell – Counsel for Appellee

No corporation that is a party to this proceeding has any parent corporation nor does any corporation in this proceeding have any publicly held corporation that owns 10% or more of its stock. No publicly traded company or corporation has an interest in the outcome of this case or appeal.

/s/ Luke Lirot
Luke Lirot, Esq.

Date: January 8, 2025.

*Counsel for Plaintiff-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

This appeal raises critical First Amendment and Fourteenth Amendment questions about Pinellas County's discriminatory conduct against the African People's Education and Defense Fund, Inc., ("APEDF") through revoking the APEDF's first approved grant and denying APEDF's second application for grant money, from the Coronavirus State and Local Fiscal Recovery Funds ("SLFRF") authorized by the American Rescue Plan Act ("ARPA"), 15 U.S.C. § 9058c, H.R. 1319, 117th Cong. (2021), based on the APEDF'S racial characteristics, the "mission" of serving African American interests, as well as based on the association the APEDF has with the "Uhuru Movement." Oral argument would likely assist this Court in deciding the significant First Amendment issues raised by this appeal.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT……………………………………………..……… ii

STATEMENT REGARDING ORAL ARGUMENT…….………………… iv

TABLE OF CONTENTS…………………………………………… v

TABLE OF CITATIONS…………………………………………... vii

INTRODUCTION ........................................................................... 1

JURISDICTION ............................................................................... 5

STATEMENT OF ISSUES ............................................................. 5

STATEMENT OF CASE ................................................................. 6

     I.     Facts Within The Amended Complaint And Exhibits To The
            Amended Complaint........................................................ 6

     II.    Procedural History ……………………………………… 17

SUMMARY OF ARGUMENT ..................................................... 18

STANDARD OF REVIEW ……………………………………... 21

ARGUMENT ................................................................................. 22

     I.     THE DISTRICT COURT ERRED IN HOLDING THAT THE
            APEDF FAILED TO STATE A CLAIM FOR DISCRIMINATION
            BASED ON THEIR FREEDOM OF ASSOCIATION…………. 22

           A.    The District Court Erred in Holding That Pinellas County Can
                Deny a Governmental Benefit, Based on an Actual or Perceived
                Association With a Disfavored Group ……………………… 22

           B.    The District Court Erred In Holding That The APEDF Failed
                To Allege That They Engaged In Constitutionally Protected
                Activity, That The County's Actions Were Motivated Or
                Caused By Exercise Of That Right, And That The County's

Conduct In Revoking Or Denying The Grant Money Deprived The APEDF Of Their Constitutional Rights ……………….. 26

C.    The District Court Erred by Going Beyond the Four Corners of the Amended Complaint to Support its Dismissal of the Amended Complaint With Prejudice ……………………….. 31

II.    THE DISTRICT COURT ERRED IN HOLDING THAT THE APEDF FAILED TO ALLEGE A CONSTITUTIONALLY PROTECTED INTEREST IN THE FIRST ARPA GRANT RADIO EQUIPMENT AND THAT THE APEDF CANNOT ESTABLISH A CONSTITUTIONALLY INADEQUATE PROCESS ……………. 33

A.    The APEDF Sufficiently Alleged A Constitutionally Protected Property Interest ……………………………………….. 34

B.    The APEDF Sufficiently Alleged A Constitutionally Inadequate Process ……………………………………………… 36

III.    THE DISTRICT COURT ERRED BY HOLDING THAT THE APEDF FAILED TO STATE FACTUAL ALLEGATIONS SUPPORTING RACE-BASED DISCRIMINATION AND FAILED TO ASSERT THAT SIMILARLY SITUATED GROUPS OUTSIDE OF ITS PROTECTED CLASS RECEIVED MORE FAVORABLE TREATMENT ………………………………………….. 37

CONCLUSION ……………………………………………………… 44

CERTIFICATE OF COMPLIANCE………………………………….. 46

CERTIFICATE OF SERVICE…………………………………….... 46

vi

# TABLE OF CITATIONS

**Cases**                                                                                          **Page**

*Am. Dental Ass'n v. Cigna Corp.*,
605 F. 3d 1283, 1288 (11th Cir. 2010) ................................................. 21

*Armont v. K12*,
3:19-cv-344-J34MCR (M.D. Fla. Dec. 26, 2019) ..................................... 25

*Artistic Entm't, Inc. v. City of Warner Robins*,
134 Fed. Appx. 306, 309 (11th Cir. 2005) ............................................. 34

*Ashcroft v. Iqbal*,
556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ....................... 21

*Bennett v. Hendrix*,
423 F.3d 1247, 1255 (11th Cir. 2005) ............................................. 26, 29

*Boy Scouts of America v. Dale*,
530 U.S. 640, 648 (2000) ............................................................. 27

*Board of Regents of State Colleges v. Roth*,
408 U.S. 564, 576 (1972) .......................................................... 34, 35

*Dolan v. City of Tigard*,
512 U.S. 374, 385 (1994) ............................................................. 29

*Flemming v. Nestor*,
363 U. S. 603, (1960) ................................................................. 34

*Gateway Cable T. V., Inc. v. Vikoa Const. Corp.*,
253 So.2d 461, 463 (Fla. App. 1971) ................................................. 25

*Garcia v. City of Trenton*,
348 F.3d 726, 729 (8th Cir. 2003) ................................................... 29

*Goldberg v. Kelly*,
397 U. S. 254 (1970) ................................................................. 34

vii

*Graham v. Richardson,*
403 U.S. 365 (1971) ............................................................ 23

*Groover v. Polk County Board of Commissioners,*
460, F.Supp.3d 1242, 1247 (Fla. M.D. 2020) ........................... 31

*Healy v. James,*
408 U.S. 169, 180-184 (1972) .............................................. 22

*John & Vincent Arduini Inc. v. NYNEX,*
129 F. Supp. 2d 162, 169 (N.D.N.Y.2001) .............................. 39

*La Grasta v. First Union Sec., Inc.,*
358 F.3d 840, 845 (11th Cir. 2004) ....................................... 32

*Lebron v. Sec'y, Fla. Dep't of Children & Families,*
710 F.3d 1202, 1217 (11th Cir. 2013) .................................... 29

*Mathews v. Eldridge,*
424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) ........... 36

*McClintock v. Eichelberger,*
169 F.3d 812 (3d Cir. 1999) ................................................ 23

*McKinney v. Pate,*
20 F.3d 1550, 1561 (11th Cir. 1994) ..................................... 36

*Mendocino Envtl. Ctr., v. Mendocino County,*
192 F.3d 1283, 1300 (9th Cir. 1999) ..................................... 29

*Nyberg v. Davidson,*
Case No. 18-13930, Page 7 (11th Cir. June 4, 2019) ................. 26

*O'Hare Truck Service, Inc. v. City of Northlake,*
518 U.S. 712, 724-25 (1996) ............................................... 22

*Perry v. Sindermann,*
408 U.S. 593, 597 (1972) ............................................... 24, 30

viii

*Pielage v. McConnell*,
516 F.3d 1282, 1284 (11th Cir. 2008) ………………………………………….... 31

*Potter v. Willford*,
Case No.: 16-13030 and 16-15743, Page 5 (11th Cir. October 5, 2017) ……….. 26

*Rhodes v. Embry-Riddle Aeronautical University*,
513 F.Supp.3d 1350, 1354 (Fla. M.D. 2021) ……………………………………… 21

*Roberts v. United States Jacyees*,
468 U.S. 609, 623 (1984) …………………………………………………… 22, 27

*Rosales v. AT & T Info. Sys., Inc.*,
702 F. Supp. 1489, 1495-1497 (D.Colo.1988) ………………………………… 39

*Santos v. General Dynamics Aviation Servs. Corp.*,
984 So.2d 658, 661 (Fla. Dist. Ct. App. 2008) …………………………..… 25

*Seay Towing, Inc. v. City of N. Miami Beach*,
U.S. Dist. LEXIS 26336, 11 (S.D. Fla. 2010) …………………………………... 34

*Shapiro v. Thompson*,
394 U.S. 618 (1969) …………………………………………………………… 23

*Sherbert v. Vener*,
374 U.S. 398 (1963) …………………………………………………….... 23, 30

*Speiser v. Randall*,
357 U.S. 513 (1958) …………………………………………………….. 23, 30

*Ultimax Transp., Inc. v. British Airways, Inc.*,
231 F. Supp. 2d 1329 (N.D. Ga. 2002) …………………………………..… 37

*United States v. Aleksandr Viktorovich Ionov, et al.*,
8:22-cr-259-WFJ-AEP (M.D. Fla) ……………………………………….... 31, 32, 33

*Wishnatsky v. Rovner*,
433 F. 3d 608 (8th Cir. 2006) ……………………………………………… 24

ix

*Wright v. Newsome*,
795 F.2d 964, 968 (11th Cir. 1986) …………………………………………... 26

**Statutes**

28 U.S.C. §1331 …………………………………………………………………... 5

28 U.S.C. §1343 …………………………………………………………………... 5

28 U.S.C. §§1367(a) …………………………………………………………… 5

28 U.S.C. §1291 …………………………………………………………………... 5

**Rules**

Rule 12(b)(6), Federal Rules of Civil Procedure ……………………..… 18, 21

Rule 8(a)(1), Federal Rules of Civil Procedure …………………………… 21

**Other Authorities**

*Judge: No prison in Uhuru-Russian conspiracy case; "it was political speech,"*
Tampa Bay Times, December 9, 2024 ………………………………..… 33

*Last 3 defendants in Uhuru-Russian conspiracy case don't get prison*, Tampa Bay
Times, December 16, 2024 …………………………………………… 33

x

## INTRODUCTION

This case concerns Pinellas County's unconstitutional discriminatory denial of American Rescue Plan Act ("ARPA") grant money to a legitimate and deserving nonprofit, the African People's Education and Defense Fund, Inc. ("APEDF"). The APEDF not only met all the criteria to support the issuance of the ARPA grant, it was deemed by the nonprofit grant administrator's independent review board to have submitted one of the most thorough and compelling applications supporting the receipt of the ARPA grant from Pinellas County. As explained below, even after being confirmed as an approved recipient of its first grant application, the APEDF had this first ARPA grant rescinded and was rejected for its second application on the basis of racial discrimination that was the product of imprecise and racially discriminatory viewpoints adopted by the Pinellas County Commission because of an "association" between the APEDF and the "Uhuru Movement," as well as discriminatory racial viewpoints as it pertained to the APEDF.

Plaintiff-Appellant, African People's Education and Defense Fund, Inc. is a Florida 501(c)(3) not-for-profit corporation headquartered in Pinellas County, Florida. The APEDF has served the Black community of South St. Petersburg in Pinellas County for 28 years, offering programs including a fitness gym, free HIV testing, free health fairs, an events venue, licensed kitchen, family festivals, marketplaces for neighborhood vendors, public forums, a community meeting place,

1

a Saturday school, and backyard vegetable gardening education. The APEDF also operates a radio station and the combined purpose of these services is to advance their "mission" to defend the human and civil rights of the black community and end the disparities faced by African people in health, healthcare, education, and economic development.

Throughout the COVID pandemic, the APEDF radio station broadcast provided timely and reliable information on public safety protocols, testing and vaccine availability, and educational programming to help community members build healthy lifestyles and strong immune systems. The radio station, WBPU, also serves the community with unique access to the world of media communications. The APEDF's noncommercial station has provided free training and internships to over 50 local residents, ranging from high school students to senior citizens. WBPU has also helped local musical artists build a fan base and secure recording contracts.

The American Rescue Plan Act ("ARPA") provided a Nonprofit Capital Project Fund to fund nonprofit capital purchases and projects to mitigate the economic harm caused by the COVID-19 pandemic to Nonprofit organizations, such as the APEDF. As stated in the ARPA overview, "the COVID-19 pandemic and the corresponding economic crisis have undermined the health and economic wellbeing of American workers. Millions of Americans, many of whom are people of color, immigrants, and low-wage workers, continue to put their lives on the line every day

2

to keep the country functioning through the pandemic. And more than 9.5 million workers have lost their jobs in the wake of COVID-19, with 4 million out of work for half a year or longer. Without additional government assistance, the economic and public health crises could drag on and our national vaccination program will be hobbled at a critical moment."

The ARPA Nonprofit Capital Project Fund is supported by federal award number SLFRP4653 awarded to Pinellas County Government by the U.S. Department of the Treasury. The Pinellas Community Foundation ("PCF"), in collaboration with the Pinellas County Board of County Commissioners, has been administering the County's nonprofit ARPA granting efforts to support capital needs in response to, and in recovery from, the COVID-19 pandemic. The PCF was contracted to objectively rate and recommend ARPA applicants, and the County took and/or approved PCF's recommendations on all applications, except those initially approved or recommended for the APEDF, clearly evincing a discriminatory animus. The County and its officials were ultimately responsible for administering the County's ARPA grants.

The APEDF initially applied for a grant from the County to fund the radio equipment that was used to help and support the black community. The County, originally, unanimously approved the grant. However, after the approval of the grants, new members were appointed to the Pinellas County Commissioners. A new

3

member of the Pinellas County Commissioners, Chris Latvala, singled out the APEDF's application and discriminated against the APEDF by citing it's association with the "Uhuru Movement."[1] Although, the APEDF is a separate and distinct entity from the "Uhuru Movement," the APEDF is associated with the "Uhuru Movement" to the extent the APEDF held similar beliefs regarding the APEDF's "mission" to defend the human and civil rights of the African American community and end the disparities faced by African people in health, healthcare, education, and economic development.

Ultimately, Pinellas County revoked the APEDF's grant money for the radio station, which was accomplished through a generic item titled "unfinished business" on a County Commission meeting agenda, with absolutely no notification to the APEDF that a proposal was planned to be introduced to rescind their original grant. Based on these same discriminatory reasons, the Pinellas County Commission later denied the APEDF's second application of grant money for a generator to be used for both the radio station and food refrigeration. The APEDF was the only non-profit whose grant money was revoked, even though the APEDF was not the only non-

---

[1] According to Wikipedia, the Uhuru Movement (pronounced /ʊhʊrʊ/, the Swahili word for "freedom") is an American socialist, Pan-Africanist movement founded in 1972 and led by the African People's Socialist Party (APSP), whose chairman is Omali Yeshitela. It is centered on the theory of African internationalism, which it says provides a historical materialist explanation for the social and economic conditions of African people worldwide. While the Uhuru Movement has had some controversial litigation, none of that litigation involves the APEDF.

4

profit asking for grant money for similar type of equipment. The APEDF asserts that all actions taken by Pinellas County with regard to their ARPA grants were predicated on direct racially discriminatory animus against the APEDF, as well as racially discriminatory animus based on the APEDF's "association" with the "Uhuru Movement," both of which manifest unconstitutional conduct on the part of Pinellas County.

## JURISDICTION

The District Court had jurisdiction under 28 U.S.C. §§1331, 1343, and 1367(a). The District Court issued an Order Granting Defendants Motion to Dismiss on September 30, 2024. (Doc.56). Plaintiffs timely appealed on October 29, 2024. (Doc.58). This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1.    Whether the District Court erred in holding that Pinellas County can deny a governmental benefit that the APEDF fully qualified for based on an actual or perceived association with a group holding controversial viewpoints regarding issues involving African Americans.

2.    Whether the District Court erred in holding that the APEDF failed to allege a constitutionally protected interest in the first ARPA grant radio equipment by failing to allege that Pinellas County's process was constitutionally inadequate.

3.     Whether the District Court erred by holding that the APEDF failed to state sufficient factual allegations supporting race-based discrimination by Pinellas County and failed to assert that similarly situated groups outside of its protected class received more favorable treatment.

## STATEMENT OF THE CASE

### I.     Facts Within The Amended Complaint And Exhibits To The Amended Complaint

The APEDF has worked to grow a healthy community by providing a variety of beneficial services, including educational, nutritional, athletic, and artistic training, support, and opportunities. This organization provides assistance to neighborhood entrepreneurs in growing their businesses and provides facilities to produce healthy food for consumption by local families. The APEDF's licensed kitchen provides a unique resource used by local entrepreneurs to build their food businesses, including nonprofit organizations, such as "Isaiah's Place," that prepared as many as 300 meals bimonthly for distribution to unhoused residents of St. Petersburg. (Doc. 35, pages 4-5).

For the 5 years prior to seeking the ARPA grants at issue herein, the APEDF operated a noncommercial low power FM radio station, licensed by the FCC, that focuses on broadcasting music and airing public affairs programming produced by and for the local Black Community in South St. Petersburg, Florida ("South St. Pete"). (Doc. 35, page 5; Doc. 35-1). The radio station, WBPU FM, serves over

6

100,000 residents in "South St. Pete," Pinellas County's largest and most concentrated historically Black community. During hurricane season, the APEDF radio station broadcasts critical preparedness tips along with up-to-the-minute news on shelter and transportation availability during such events. (Doc. 35, page 5; Doc. 35-1). Throughout the COVID pandemic, the APEDF provided timely and reliable information on public safety protocols, testing and vaccine availability, and educational programing to help community members build healthy lifestyles and maintain strong immune systems. (Doc. 35, page 5; Doc. 35-1).

On September 8, 2022, the APEDF applied for an ARPA grant for the purchase of radio station equipment to continue broadcasting timely information on local health and educational services. (Doc. 35, page 7; Doc. 35-1). On November 15, 2022, the APEDF grant for radio station equipment, emergency alerts, as well as free job training opportunities, after being vetted and recommended by the Pinellas Community Foundation's independent review board, was voted on and unanimously approved by the Pinellas County Board of County Commissioners. (Doc. 35, pages 7-8; Doc. 35-2, page 10-11). The Pinellas County Board of County Commissioners approved grant funding to be awarded to the highest ranked small nonprofit organizations, including APEDF, which was ranked 4th out of over 50 applications. (Doc. 35-2, page 10-11).

On November 17, 2022, the APEDF received an email from the Pinellas Community Foundation stating that their "small capital project" had been approved by the Pinellas County Board of County Commissioners. (Doc. 35, page 8; Doc. 35-3). On November 23, 2022, the APEDF was sent another email from the Pinellas Community Foundation stating, that the Pinellas County Board of County Commissioners approved their "small capital project," and the APEDF would be funded in the amount of $36,801.00, and that there would be a contract sent to them to sign. (Doc. 35, page 8; Doc. 35-4). On January 9, 2023, the Pinellas Community Foundation sent a drafted contract to the APEDF for the radio equipment grant. (Doc. 35, page 8; Doc. 35-5). On February 9, 2023, the APEDF "accepted the offer" and signed the contract, returning the signed contract to Pinellas Community Foundation. (Doc. 35, page 9; Doc. 35-5).

On February 7, 2023, three months after the first APEDF ARPA Application had been approved by the Commission on November 15, 2022, Chris Latvala, a newly seated member of the Pinellas County Board of County Commissioners, sent Tyler Bonneau, Latvala's "executive aide," screenshots through text messages, of the list of grants approved, and he asserted the APEDF was associated with the "Uhuru Movement," which association was expressed as a basis for revocation of the first approved APEDF ARPA Grant. (Doc. 35, page 9; Doc. 35-6). Specifically, Chris Latvala and Tyler Bonneau texts state,:

8

> Chris Latvala: Google the African people's one.
> Tyler Bonneau: That's the Uhuru House in St. Pete.
> Chris Latvala: Yeah
> Tyler Bonneau: Their website doesn't look so good.
> Chris Latvala: I'm going to raise hell.

(Doc. 35-6).

On February 9, 2023, Chris Latvala sent Tyler Bonneau text messages asking him to find out if the APEDF or the "uhurus"(sic) are a "hate group." (Doc. 35, page 9; Doc. 35-7). Tyler Bonneau replied to Chris Latvala's text, stating, "the Uhuru movement has ties to antisemitic Black Nationalist Organizations." (Doc. 35, page 9; Doc. 35-7). No communication were exchanged explaining or supporting any such "ties" to the APEDF. (Doc. 35, page 9). Included in these text messages, Chris Latvala then texts Tyler Bonneau and asks whether the radio equipment is for "Black Power 96." Tyler Bonneau replies, "it doesn't go into that much detail but it says online that it's a project of the African Peoples Fund that's listed on ARPA." (Doc. 35, page 9; Doc. 35-7). Chris Latvala ends the conversation with "great work." (Doc. 35, page 9-10; Doc. 35-7).

On February 9, 2023, at the Pinellas Board of County Commissioners' Work Session, Chris Latvala expressed his opposition to funding the APEDF because of being "associated with the aroohoos," (sic), and asked Duggan Cooley, Pinellas Community Foundation CEO, "how would a group that has ties to anti-semitic

nationalist groups get approved for funding?"[2] Duggan Cooley responded that, "they went through the funding process like other organizations." (Doc. 35, page 10; Doc.35-8). We were concerned about some of the issues that have arisen because of the FBI investigation. (Doc. 35, page 10; Doc. 35-8). We had some conversations with the county about this particular application um and asked questions as to whether or not some of that should be disqualifying for the organization and the feedback that we received especially around the FBI investigation was that if they are not on the list they are not on the list of organizations that can't contract with the county or not on the list to be barred from receiving federal funds, that they should go through and be scored in this process like every other organization." (Doc. 35, page 10; Doc. 35-8). At the same Work Session, Chris Latvala then asked Duggan Cooley, "do you believe that they're a group or a story that should be considered a

---

[2] In addition to the County Commissioner's accusation that grant applicant APEDF has associated with an organization that allegedly associates with other organizations that have been accused of antisemitism, in the continued effort to impugn APEDF during discovery, in its Motion to Compel, counsel for Pinellas County went so far as to attribute acts of antisemitic violence and murder to members of the Uhuru Movement. (Doc. 40). Based on research done on the source of this information, and confirmation that the County's allegations had absolutely no factual basis, and misrepresented their cited source, in accordance with local rule 3.01(g) a proposed Motion to Strike was sent in an effort to confer on these inaccurate accusations. APEDF referenced these misrepresentation in their Response in Opposition to Pinellas County's Motion to Compel. (Doc. 47; Doc. 47-1). Counsel for the County did not express disagreement with the allegations that the information was totally inaccurate, and filed a Notice of Withdrawal of the Motion to Compel and filed an Amended Motion to Compel that eliminated any reference to said inaccurate information. (Doc. 48; Doc. 49).

something that we should be proud of, based on your earlier statements." (Doc. 35, page 11; Doc. 35-8). Duggan Cooley responded, "I think it's an organization that, based on the application that they submitted and the information that they requested um and reviewed publicly by a committee that there was belief that there would be reasonable community benefit from the allocation that they were offered." (Doc. 11; Doc. 35-8).

On February 13, 2023, Chris Latvala sent a text message to Tyler Bonneau asking him to "write down that African group on a sheet a paper for the meeting. I think they received funding in both groups." (Doc. 35, page 11; Doc. 35-9). On February 14, 2023, at the Pinellas County Board of Commissioners Meeting on that date, with absolutely no notice and no opportunity for the APEDF to be heard, the Commission rescinded the APEDF's previously approved grant for radio station equipment as "Item 24" was being discussed at the meeting. (Doc. 35, page 11; Doc. 35-10; Doc. 35-11, Page 9).

When the original approval of the ARPA grant for the first APEDF Application was to be considered and was ultimately rescinded on February 14, 2023, absolutely no one associated with or representing the APEDF was notified or given even a modicum of "constructive notice" that this issue would be on the Agenda for that date. (Doc. 35, page 12; Doc. 35-10).

11

After the first application was submitted, and long before it was rescinded, as described above, on January 14, 2023, the APEDF applied for a second ARPA grant through the Pinellas Community Foundation for the purchase and installation of a "whole building back-up power generator," because the APEDF facility in South St. Petersburg had experienced frequent power outages caused by storms and an aging power grid infrastructure, most notably in times of emergency. (Doc. 35, page 12; Doc. 35-12, page 7). In those instances when the power would go out, even if temporarily, the building would be forced to close its doors. (Doc. 35, page 12; Doc. 35-12, page 7). The APEDF radio station, which was relied upon by the community for critical emergency alerts, would go off the air. (Doc. 35, page 12; Doc. 35-12, page 7). The kitchen would also be closed and substantial amounts of food stored in the 2 commercial refrigerators and 2 commercial freezers in the building would be lost. (Doc. 35, page 12-13; Doc. 35-12, page 7).

The APEDF had planned to acquire and install a generator system but has not been able to do so because of COVID-19 related financial limitations, lost revenue due to shut-downs, and diversion of staff away from fundraising activities, as well as other deprivations caused by the direct and indirect consequences of the COVID-19 pandemic. (Doc. 35, page 13; Doc. 35-12, page 7). The APEDF's application received an received a profoundly positive review by the PCF. (Doc. 35-13).

PCF Director Duggan Cooley stated in an email on February 28, 2023, that, "The ARPA Nonprofit Capital Project Fund eligibility requires that the funding benefit 501(c)3 direct service nonprofits. It is impossible to isolate the benefit of generators to solely benefit the African People's Education and Defense Fund, the nonprofit which has applied for funding for the generator." (Doc. 35, page 13; Doc. 35-14).

Notably, the eligibility criteria posted on the Pinellas Community Foundation, ARPA Nonprofit Capital Project Fund website did not list any concern about nonprofits "sharing" a location or any other benefit with any type of group. Numerous other recipients of ARPA grants (i.e., the YMCA) also provide utilization of their physical structures to "other groups" or other uses. (Doc. 35, page 13-14; Doc. 35-15).

On March 9, 2023, PCF Director Cooley sent out a memorandum for the recommendations on funding grants. (Doc. 35, page 14; Doc. 35-16). Attached to the memorandum was the "Large Capital Projects Committee Ranking and Review/Award Recommendations." (Doc. 35, page 14; Doc. 35-16). The APEDF application for the backup generator was ranked 4th out of 19 other approved applications, out of a total of 78 applications. (Doc. 35, page 14; Doc. 35-16). This document added a "footnote" reflecting a "concern" about nonprofits "sharing" what

was described as "benefit" which could not be "isolated" to the 501(c)(3) applicant. (Doc. 35, page 14; Doc. 35-17).

The entirety of actual communications between the Pinellas Community Foundation and any member of the County Commission are unknown, and, even though the APEDF was still listed, it was apparently placed under significantly greater scrutiny than any other ARPA applicant, presumably because of pressure from the County based on the racial and "associational" issues described above. (Doc. 35, page 14).

On May 25, 2023, the Pinellas County Commission staff recommended changes to the list of application recommendations including a directive to "unassign the funding for the African People's Education and Defense Fund, Inc.," (because the project will also not directly counteract the effects of COVID 19). (Doc. 35, page 15; Doc. 35-18).

Despite its initial high position and recommendation for approval, the APEDF application for a back-up power generator was denied by the Pinellas County Board of County Commissioners at the Meeting on June 13, 2023. (Doc. 35, page 15; Doc. 35-19). Plausibly, the County seemed to have taken an unsupported and inaccurate view of the APEDF and has engaged in the following unconstitutional actions, as stated in the Complaint:

14

a. The County disavowed the previously approved funding, and denied the second effort to obtain funding, for reasons that were content based, arbitrary and unconstitutional. The County rejected this funding because they have taken a position in direct conflict with the free speech protected activities of the Uhuru Movement, and the County has tried to assert that the APEDF is same entity as the Uhuru Movement, which is not accurate. The Uhuru Movement is not a distinct or formal entity, but a broad characterization of like-minded groups and individuals promoting Black community empowerment, such as the "Black Power Movement" or the "Civil Rights Movement" APEDF is indeed part of this broad pro-Black tendency and claims its right to association. Its community center on 18th Avenue is called the Uhuru House because "Uhuru" means "freedom" in Swahili. (Doc. 35, page 15-16). (Doc. 35, page 15-16).

b. The County's mention of the "FBI raids" on the Uhuru Movement as a "red flag," is manifest and unconstitutional "guilt by association," but the APEDF nonprofit, its Board, and its staff are NOT under FBI investigation, nor indictment. (Doc. 35, page 16).

c. Members of the County made false statements, defaming APEDF with false accusations that APEDF carried out a "criminal act" of running candidates for office, which is prohibited and illegal for a nonprofit organization to do, and which would have prompted the IRS to revoke APEDF's nonprofit status which remains

15

unchallenged. The APEDF has never run any candidates for political office. (Doc. 35, page 16).

d. The County also slandered the APEDF as antisemitic. Tampa Bay Times reporter Jack Evans looked into this accusation and wrote, "The Anti-Defamation League, in a report issued last year, noted links between the Uhuru Movement and Black nationalist groups, such as the Nation of Islam, with a history of antisemitism, but it did not accuse the Uhurus of direct antisemitic activity." This erroneous and unsupported conclusion is based on entirely inaccurate information, and, without question, did not reflect any aspect of the APEDF. For the record, the APEDF is not antisemitic. (Doc. 35, page 16-17).

e. The APEDF was denied procedural due process in the earlier decision to rescind and deny the recommended funding on February 14, 2023, because the vote to rescind was not properly noticed by the Board of County Commissioners for any action on that date. Commissioner Latvala introduced the motion to rescind the funding under Agenda Item #24, "County Commission New Business: Pertinent and Timely          Committee/Board          Updates,          Policy          Considerations, Administrative/Procedural Considerations, and other New Business." There was no mention of the APEDF or that their ARPA grant was going to be considered for any action of any kind. (Doc. 35, page 17).

## II.    Procedural History

On October 20, 2023, the APEDF filed a Complaint against Pinellas County in the United States District Court for the Middle District of Florida. (Doc. 1). The Complaint alleged that Pinellas County violated the APEDF's First Amendment right of freedom of association by revoking and denying them grant money based on their association with the "Uhuru Movement," Pinellas County violated the APEDF's due process right of the Fourteenth Amendment by revoking the grant money without notice or an opportunity to be heard, and, last, that Pinellas County racially discriminated against the APEDF. (Doc. 1).

On December 1, 2023, Pinellas County filed a Motion to Dismiss the Complaint for failure to state a claim. (Doc. 16). On December 28, 2023, the APEDF filed a Response in Opposition to Pinellas County's Motion to Dismiss the Complaint. (Doc. 28). The District Court issued an Order Granting in Part and Denying in Part Pinellas County's Motion to Dismiss. (Doc. 33).

Specifically, the District Court deferred ruling on the First Amendment retaliation claim, granted dismissal of APEDF's due process claim and granted dismissal of APEDF's race discrimination claim all with leave to amend the Complaint. (Doc. 33).

On March 12, 2024, the APEDF filed an Amended Complaint and attached 19 exhibits. (Doc. 35). The Amended Complaint alleged that Pinellas County

17

violated the APEDF's First Amendment right of freedom of association by revoking and denying them grant money based on their association with the "Uhuru Movement," that Pinellas County violated the APEDF's due process right under the Fourteenth Amendment by revoking their approved ARPA grant funds without notice or an opportunity to be heard, and that Pinellas County racially discriminated against the APEDF.

On March 26, 2024, Pinellas County filed a Motion to Dismiss the Amended Complaint. (Doc. 36). On May 9, 2024, the APEDF filed a Response in Opposition to the Motion to Dismiss the Amended Complaint. (Doc. 39). On September 30, 2024, the District Court issued an Order granting Pinellas County's Motion to Dismiss the Amended Complaint with prejudice. (Doc. 56). For the reasons stated below, the District Court erred in Granting Pinellas County's Motion to Dismiss with Prejudice.

## **SUMMARY OF ARGUMENT**

The APEDF stated a claim for relief in a well-pled complaint as required by Rule 12(b)(6). The APEDF stated a claim for violation of the First Amendment "freedom of association." The "Government," that being Pinellas County, cannot deny a benefit based on discriminatory views of a group's exercise of freedom of association. That is exactly what happened in this case. The APEDF had their ARPA grant money revoked and denied based on their perceived but imprecise

18

"association" with the "Uhuru Movement." The APEDF conceded an association to the "Uhuru Movement," as both the APEDF and the "Uhuru Movement" share beliefs in black empowerment, but they are separate and distinct organizations, and are not even the same type of entity as the APEDF is a formal 501c3 nonprofit and the Uhuru Movement being more of a broad network.

The District Court erred, because the APEDF does not need to show a generic or formal contractual relationship with Pinellas County, since the "offer and acceptance" associated with the ARPA grant created a sufficiently binding agreement such that  Pinellas County could not retaliate against the APEDF and revoke their grant funding based on their association with the "Uhuru Movement." The APEDF alleged that Pinellas County revoked their grant, largely based on this "association." Additionally, the APEDF alleged that their rights have been violated because the County punished the APEDF for their exercise of  freedom of association.

Additionally, the APEDF stated a claim for violation of the Fourteenth Amendment and their due process rights. The APEDF alleged that their due process rights were violated because they had a protected interest in the grant money through their recognized and lauded eligibility, Pinellas County's approval of the APEDF application, and the tender of an agreement reflecting the approval of the initial grant application that the APEDF "executed" and returned to the County. The APEDF has

19

also alleged that the contract was revoked by Pinellas County without any form of notice or an opportunity to be heard. This is a clear violation of the APEDF's due process rights.

Finally, The APEDF stated a valid claim for racial discrimination. The APEDF alleged sufficient facts to establish that the APEDF was the victim of racial discrimination. The APEDF stated that they have a Black president, predominantly Black staff, a Black radio station manager, Black hosts, and, regardless of other individuals of other races, the stated purpose and mission of the APEDF was to serve the Black Community. Most importantly, Pinellas County perceived the APEDF to be a "Black organization," and racially discriminated against them based on their association with the "Uhuru Movement."

The APEDF also gave sufficient facts to show that the APEDF's "comparators" were similarly situated and not the targets of any type of discrimination, unlike the APEDF. In fact, the APEDF was ranked 4th out of all the other applicants for need and eligibility for the ARPA grant. Nonetheless, the APEDF was the only non-profit ARPA applicant to have their grant revoked or denied. After the clear evidence and formalities of ARPA grant approval and the concise and thorough establishment of the APEDF's clear eligibility for these ARPA grants, the discussions amongst the County Commissioners leaves no other conclusion than the fact that the County's treatment of the APEDF's ARPA grants

20

was based entirely on racially discriminatory reasons, both directly and on "associational" factors.

Based on the forgoing, this Court should REVERSE the District Court and remand with instructions to DENY Pinellas County's Motion to Dismiss the Amended Complaint and allow the APEDF to either prosecute their action, or, if deemed absolutely necessary, to be given leave to amend their operative Complaint to seek relief for the obvious constitutional deprivations they have suffered through a properly administered action in the United States District Court.

## **STANDARD OF REVIEW**

The standard of review of a District Court's grant of a Motion to Dismiss under Rule 12(b)(6) for failure to state a claim is *de novo*. *Am. Dental Ass'n v. Cigna Corp.*, 605 F. 3d 1283, 1288 (11th Cir. 2010). "A complaint must contain 'a short and plain statement of the claim showing that the pleader is entitled to relief." *Rhodes v. Embry-Riddle Aeronautical University*, 513 F.Supp.3d 1350, 1354 (Fla. M.D. 2021) (quoting FED. R. CIV. P. 8(a)(1). "The complaint 'must contain sufficient factual matter, accepted as true,' to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "A claim is plausible on its face when the plaintiff 'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."' *Id.*

21

The APEDF met the Rule 12(b)(6) requirements and, as such, this Court should reverse the District Court's Order granting Pinellas County's Motion to Dismiss the Amended Complaint with Prejudice.

## ARGUMENT

## I.    THE DISTRICT COURT ERRED IN HOLDING THAT THE APEDF FAILED TO STATE A CLAIM FOR DISCRIMINATION BASED ON THEIR FREEDOM OF ASSOCIATION.

### A.    The District Court Erred in Holding That Pinellas County Can Deny a Governmental Benefit, Based on an Actual or Perceived Association With a Disfavored Group.

When it comes to governmental funding and contracts, the government has discretion in awarding contracts and can base its decision on any number of reasons. *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 724-25 (1996). That being said, the government cannot deny a government benefit or contract based on unconstitutional grounds. See *Id.* 725-26. "Government actions that may unconstitutionally infringe upon this freedom may take many forms. Among other things, government may seek to impose penalties or withhold benefits from individuals because of their membership in a disfavored group. *Roberts v. United States Jacyees*, 468 U.S. 609, 623 (1984) (citing *Healy v. James*, 408 U.S. 169, 180-184 (1972).

The Supreme Court has never held that a public entity may exclude bidders or applicants for government contracts based solely on their views. The District Court

22

used flawed reasoning by asserting that the Third Circuit Court of Appeal has refused to extend First Amendment protection to a bidder or applicant for a government contract. *McClintock v. Eichelberger*, 169 F.3d 812 (3d Cir. 1999). (Doc. 56, page 6). *McClintock* is distinguishable from this case because *McClintock* dealt with the issue of employment by the government and independent contractors. This case, however, deals solely with the application of a grant for money to help with the devastating effects that the Covid 19 pandemic had on the financial existence of non-profit organizations that suffered from dramatically decreased contributions as contemplated by the ARPA program, ***not*** any type of employment by the government.

Unlike the cases relied on by the District Court, this case is more similar to the denial of an application for tax exemptions, denial of an application for welfare, and the denial of an application for unemployment benefits. See *Speiser v. Randall*, 357 U.S. 513 (1958); *Sherbert v. Vener*, 374 U.S. 398 (1963); *Shapiro v. Thompson*, 394 U.S. 618 (1969); and *Graham v. Richardson*, 403 U.S. 365 (1971). In this case, the APEDF had their first "contract" for grant money to fund their radio equipment revoked and their second application for grant money to fund a generator denied based on no other tangible reason than their association with the "Uhuru Movement." If the government were allowed to deny non-profit grant money based on the viewpoint of the non-profit, that would clearly be a violation of the constitution.

23

At least one Circuit Court has held that denial of government-funded legal service simply because the affected party engaged in protected speech was unconstitutional, even where that affected party did not have a preexisting relationship with the government. *Wishnatsky v. Rovner*, 433 F. 3d 608 (8th Cir. 2006). *Wishnatsky* stated, "denial of participation in a state-sponsored program based on the party's beliefs or advocacy is unconstitutional:

> Even though a person has no "right" to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests — especially, his interest in freedom of speech."

*Id.* at 611. (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

Similarly, Pinellas County cannot deny the APEDF the benefit of a grant that they are eligible for simply because the APEDF was perceived as being associated with what the County viewed as a disfavored group, to wit: the "Uhuru movement."

Even if this Court finds that there needs to be a preexisting relationship to assert a cause of action for a constitutional deprivation, the APEDF had the equivalent of a contractual relationship with Pinellas County to receive grant money for radio equipment. Pinellas County drafted and gave APEDF a contract for grant money on the radio equipment. APEDF signed the contract and sent the contract back to Pinellas County. Pinellas County ultimately revoked the contract that APEDF signed.

24

Under Florida law, which is used in Federal proceedings, a contract does not require both signatures in order to be valid. "A contract may be binding on a party despite the absence of a party's signature. The object of a signature is to show mutuality or assent, but these facts may be shown in other ways, for example, by the acts or conduct of the parties." *Gateway Cable T. V., Inc. v. Vikoa Const. Corp.*, 253 So.2d 461, 463 (Fla. App. 1971). "[W]hen a [contract] is not signed, we look to a party's words and conduct to determine whether the party assented to the agreement." *Armont v. K12*, 3:19-cv-344-J34MCR (M.D. Fla. Dec. 26, 2019). *Santos v. General Dynamics Aviation Servs. Corp.*, 984 So.2d 658, 661 (Fla. Dist. Ct. App. 2008).

As shown in the below specified Exhibits to the Amended Complaint, on November 15, 2022, the Pinellas County Board of County Commissioners approved grant funding to be awarded to the highest ranked small nonprofit organizations, including APEDF. (Doc. 35, page 8; Doc. 35-2). On November 17, 2022, and on November 23, 2022, APEDF received an email from the Pinellas Community Foundation stating that their small capital project had been approved by the Pinellas County Board of County Commissioners. (Doc. 35, page 8; Doc. 35-3 and 35-4). Additionally on January 9, 2023, the Pinellas Community Foundation sent a drafted contract and on February 8, 2023, the Pinellas Community Foundation sent an email with affirmation of the final contract to APEDF to award $36,801.00. (Doc. 35, page 8-9).

25

The APEDF had an existing contractual relationship with Pinellas County for grant money to fund the radio equipment, that was revoked, based solely on the perceived and imprecise "association' that the APEDF had with the "Uhuru Movement." Therefore, Pinellas County violated the APEDF's First Amendment right to freedom of association by revoking the first ARPA grant based on the APEDF's "association" with the "Uhuru Movement."

**B.      The District Court Erred In Holding That The APEDF Failed To Allege That They Engaged In Constitutionally Protected Activity, That The County's Actions Were Motivated Or Caused By Exercise Of That Right, And That The County's Conduct In Revoking Or Denying The Grant Money Deprived The APEDF Of Their Constitutional Rights.**

Courts have consistently "held that it is clearly established that public officials may not retaliate against private citizens for exercising their First Amendment rights." *Potter v. Willford*, Case No.: 16-13030 and 16-15743, Page 5 (11th Cir. October 5, 2017) (citing *Bennett v. Hendrix*, 423 F.3d 1247, 1255 (11th Cir. 2005). "The crux of a retaliation claim is that someone suffered an adverse action for having exercised a constitutional right, not that the adverse action deprived someone of such a right." *Nyberg v. Davidson*, Case No. 18-13930, Page 7 (11th Cir. June 4, 2019) (citing *Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986). To establish retaliation in violation of the First Amendment, a Plaintiff must show that (1) they engaged in a constitutionally protected activity (2) "the defendant's retaliatory conduct was likely to 'deter a person of ordinary firmness from the exercise of their

26

First Amendment rights;'" and (3) there is a casual connection between the retaliatory conduct and the adverse effect on the First Amendment right. *Id*. at 6. "Even when the deterrent is small, the retaliation may still be actionable." *Id*.

The Supreme Court has described expressive association as the "right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984). To that end, the right of expressive association exists so that people may associate with others "in pursuit of a wide variety of political, social, economic, educational, religious, and cultural" goals. *Id*. at 622. For a group to be protected by the First Amendment's expressive associational right, the group must engage in expressive association, whether public or private. *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000).

The District Court erroneously found that the APEDF did not adequately allege that the APEDF engaged in a constitutionally protected activity. (Doc. 56, page 7). In the Amended Complaint, the APEDF alleged:

> The County disavowed the previously approved funding, and denied the second effort to obtain funding, for reasons that were content based, arbitrary and unconstitutional. The County rejected this funding because they have taken a position in direct conflict with the free speech protected activities of the Uhuru Movement, and the County has tried to assert that the APEDF is same entity as the Uhuru Movement, which is not accurate. The Uhuru Movement is not a distinct or formal entity, but a broad characterization of like-minded groups and individuals

27

promoting Black community empowerment, such as the "Black Power Movement" or the "Civil Rights Movement" APEDF is indeed part of this broad pro-Black tendency and claims its right to association. Its community center on 18th Avenue is called the Uhuru House because "Uhuru" means "freedom" in Swahili.

(Doc. 35, page 16).

The APEDF engaged in a constitutionally protected activity of "association" by associating themselves with the "Uhuru Movement" in promoting Black community empowerment. Additionally, the ARPA grants were revoked and denied by Pinellas County based on this "association," as clearly alleged throughout the Amended Complaint. Specifically, the APEDF asserts that, "On February 7, 2023, after the first APEDF ARPA Application had been approved by the Commission on November 15, 2022, Chris Latvala, a newly seated member of the Pinellas County Board of County Commissioners, sent Tyler Bonneau, Latvala's 'executive aide,' screenshots through text messages, of the list of grants approved, and he asserted the APEDF was associated with the Uhuru Movement, which association was expressed as a basis for revocation of the first approved APEDF ARPA Grant." (Doc. 35, page 9). Further, APEDF asserted that Pinellas County's conduct deprives APEDF and members of APEDF of their rights, in violation of the Freedom of Association protected by the First Amendment. (Doc. 35, page 18). The District Court erroneously found that the APEDF must show that the denial of grant money precluded them from engaging in protected First Amendment activity because they

are free to engage in the protected expressive association without the benefit of the grant funding and in fact do so. This statement completely misses the point. It is well established in this Court that, "[I]t would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity" *Bennett v. Hendrix*, 423 F.3d 1247, 1252 (11th Cir. 2005) (quoting *Mendocino Envtl. Ctr., v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999). Noting that "the question is not whether the Plaintiff herself was deterred …" *Id.* at 1255 (quoting *Garcia v. City of Trenton,* 348 F.3d 726, 729 (8th Cir. 2003).

It has been stated that denying a benefit based on a reason that violates constitutional rights is unconstitutional and creates an adverse effect. "Under the well settled doctrine of 'unconstitutional conditions' the government may not require a person to give up a constitutional right in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the right." *Lebron v. Sec'y, Fla. Dep't of Children & Families*, 710 F.3d 1202, 1217 (11th Cir. 2013) (quoting *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994). The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, ***his exercise of those freedoms would in effect be***

29

*penalized and inhibited*." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). (emphasis added). See *Sherbert v. Verner*, 374 U.S. 398, 406 (1963) ("To condition the availability if benefits upon this appellant's willingness to violate a cardinal principal of her religious faith effectively penalizes the free exercise clause of her constitutional liberties"); see also *Speiser v. Randall*, 357 U.S. 513 (1958)("to deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech").

In this case, the APEDF was a nonprofit organization who needed money due to the tragic effects of Covid in order to continue providing services to the community. The Defendant is the Pinellas County Board of Commissioners, the final decision maker on whether nonprofit organizations would receive these grant benefits to further their organization's purpose. The APEDF was requesting federal grant funding that they urgently needed to further their organization's purpose, and the County revoked their grant and denied them any further grant money, based on the perception that the APEDF was "associated" with the "Uhuru Movement." This is clearly an adverse action taken in a public and recorded meeting that would likely deter a nonprofit organization of ordinary firmness from engaging in their freedom to associate, and in the instant action forces the APEDF to spend more effort on fundraising and less time delivering their philanthropic services to the community.

The County's actions have clearly had a tangible negative impact on the work sought to be done by the APEDF.

Based on the foregoing, the APEDF has adequately asserted a claim for violation of their First Amendment right to Freedom of Association.

## C.    The District Court Erred by Going Beyond the Four Corners of the Amended Complaint to Support its Dismissal of the Amended Complaint With Prejudice.

One of the troubling aspects of the District Court's Order is the reference to the aspects involved in the case *United States v. Aleksandr Viktorovich Ionov, et al.*, 8:22-cr-259-WFJ-AEP (M.D. Fla). (Doc. 56, page 2-3, n. 1). APEDF is not involved in the *Ionov* case and has no connection with the *Ionov* case, and the *Ionov* case should not have been considered in the District Court's Order. These references clearly show that the District Court went beyond the four corners in the Amended Complaint, in granting the Motion to Dismiss the Amended Complaint .

"When considering a Rule 12(b)(6) motion, the Court accepts all factual allegations of the complaint as true and construes them in the light most favorable to the plaintiff." *Groover v. Polk County Board of Commissioners*, 460, F.Supp.3d 1242, 1247 (Fla. M.D. 2020) (citing *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). "Courts should limit their 'consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters

judicially noticed.'" *Id.* (citing *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004).

APEDF is not involved in the *Ionov* case. The District Court went beyond the four corners of the Complaint to note aspects of the *Ionov* case which has no relation to the APEDF.

Not only is the *Ionov* case not related to APEDF, the *Ionov* case was misrepresented in the District Court's Order. The District Court states, "The African People's Socialist Party and Uhuru Movement promoted Russia's views using multiple media outlets, including a radio station." (Doc. 56, page 3). This is an incorrect statement, and misrepresents the Indictment (*Ionov,* Doc. 12), in the *Ionov* case which states, "The African People's Socialist Party and the Uhuru Movement (collectively, the "APSP") was a political group based in St. Petersburg, Florida. The APSP promoted its views using multiple media outlets, including websites it operated, social media, and a radio station."... promoted *its* views, meaning its *own* views, not Russia's.

The *Ionov* case alleged that some members of the "Uhuru Movement" were involved in Federal Criminal proceedings based on allegedly conspiring to act as foreign agents of the Russian government. The trial in this matter concluded with a verdict on some of the relevant counts. It should be noted that no jail sentences were imposed on any Uhuru related Defendant and all Defendants were acquitted of the

32

foundational charge. Additionally, during sentencing, the District Court in *Ionov* noted that the Defendants' "conduct ultimately amounted to the exercise of free speech." The District Court in *Ionov* stated, "everything they did here was political speech." *Judge: No prison in Uhuru-Russian conspiracy case; "it was political speech,"* Tampa Bay Times, December 9, 2024. During sentencing on the remaining Defendants, the District Court stated, "All of these statements, all of these words, if there weren't a reporting requirement, are completely protected." *Last 3 defendants in Uhuru-Russian conspiracy case don't get prison*, Tampa Bay Times, December 16, 2024.

Obviously, reference to any aspect of the *Ionov* case reflects that the District Court considered matters outside the four corners of the Amended Complaint. More concerning, however, is the fact that The District Court did not accurately describe the contents of the *Ionov* Indictment as it pertained to the APEDF radio station WBPU. These characteristics of the District Court's order should be viewed by this Court with great concern as to the fairness and impartiality of the District Court.

## II.    THE DISTRICT COURT ERRED IN HOLDING THAT THE APEDF FAILED TO ALLEGE A CONSTITUTIONALLY PROTECTED INTEREST IN THE FIRST ARPA GRANT RADIO EQUIPMENT AND THAT THE APEDF CANNOT ESTABLISH A CONSTITUTIONALLY INADEQUATE PROCESS.

"To establish a procedural due process claim, a plaintiff must show: '(1) a deprivation of a constitutionally-protected liberty or property interest; 2) state action;

and (3) constitutionally inadequate process."' *Seay Towing, Inc. v. City of N. Miami Beach*, U.S. Dist. LEXIS 26336, 11 (S.D. Fla. 2010) (quoting *Artistic Entm't, Inc. v. City of Warner Robins*, 134 Fed. Appx. 306, 309 (11th Cir. 2005).

## A.    The APEDF Sufficiently Alleged A Constitutionally Protected Property Interest.

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. These interests -- property interests -- may take many forms." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 576 (1972). "Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process." *Id*. (citing *Goldberg v. Kelly*, 397 U. S. 254 (1970) [Footnote 15] See *Flemming v. Nestor*, 363 U. S. 603, (1960).

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. *Id*. "He must have more than a unilateral expectation of it." *Id*. "He must, instead, have a legitimate claim of entitlement to it." *Id*. "It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined." *Id*. "It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims." *Id*.

34

"Property interests, of course, are not created by the Constitution." *Id*. "Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id*. "Thus, the welfare recipients in *Goldberg v. Kelly*, supra, had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them." *Id*. "The recipients had not yet shown that they were, in fact, within the statutory terms of eligibility." *Id*. "But we held that they had a right to a hearing at which they might attempt to do so." *Id*.

Contrary to the District Court's assertion, Pinellas County's efforts to revoke the first ARPA grant after documents were exchanged to memorialize the award of the ARPA grant to the APEDF is not a simple "breach of contract." The unconstitutional deprivation of APEDF grant money is based both on the "agreement" that was exchanged, but also from the determination and confirmation of the eligibility requirements that APEDF clearly met, as they were ranked *4ᵗʰ*, as compared to all other applications under the recommendation of the PCF. APEDF met all of the eligibility requirements to receive the grant money, was recognized and noted as having done so, thus, this is not a mere "breach of contract" action.

35

**B.      The APEDF Sufficiently Alleged A Constitutionally Inadequate Process.**

"[T]he Constitution requires that the state provide fair procedures and an impartial decision maker before infringing on a person's life, liberty, or property." *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir. 1994). "The fundamental requirement of due process is an opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976); the APEDF had a property interest to the first approved grant of $36,801.00 for the radio equipment. The APEDF was therefore entitled to notice and hearing prior to the unilateral revocation of the first ARPA grant. However, the Pinellas County revoked the radio equipment grant money without giving APEDF any notice or hearing. The District Court erroneously concluded that this "deprivation" was more appropriately pursued in a "state court" breach of contract action. (Doc. 56, page 10). This conclusion shows a purposeful effort to completely ignore the constitutional dimensions and facts obvious in the issues between the APEDF and Pinellas County.

The APEDF is not asserting that there was a simple breach of contract, the APEDF is showing that they were entitled to the ARPA grant money through an appropriate application having been approved by the Pinellas County Board of County Commissioners through multiple emails expressing the grant approval, as well as the sending of a contract, but this "breach" was not simply the failure to

36

provide a load of potatoes, it was governmental conduct predicated on a discriminatory racial animus, unconstitutional "associational" concerns, and an entirely obvious course of conduct grounded in "Federal Question" considerations. Pinellas County held a meeting where there was no notice to the APEDF that their application would be on the agenda to be considered for revocation and there was no opportunity for the APEDF to be heard. Therefore, the APEDF has alleged a constitutionally inadequate process.

## III.    THE DISTRICT COURT ERRED BY HOLDING THAT THE APEDF FAILED TO STATE FACTUAL ALLEGATIONS SUPPORTING RACE-BASED DISCRIMINATION AND FAILED TO ASSERT THAT SIMILARLY SITUATED GROUPS OUTSIDE OF ITS PROTECTED CLASS RECEIVED MORE FAVORABLE TREATMENT.

Corporations can state a claim of racial discrimination under the Equal Protection Clause of the Fourteenth Amendment. At least one District Court in this Circuit has found racial standing for a corporation. *Ultimax Transp., Inc. v. British Airways, Inc.*, 231 F. Supp. 2d 1329 (N.D. Ga. 2002). In *Ultimax* the Court concluded that "Plaintiff presented sufficient evidence that it is entitled to assert a claim as a member of a 'protected class' based on race of its president and CEO, and the race of the majority of its employees. *Id.* at 1338. Similarly to *Ultimax*, the APEDF was injured by having their first ARPA grant revoked and their second application denied based on the race of APEDF's President, the majority of their employees, and the community and mission the APEDF serves.

37

The District Court erroneously held that the APEDF did not provide sufficient facts for the court to determine the "racial identity" of the APEDF. (Doc. 56, page 12). In addition to the obvious "mission statement" of the APEDF, the APEDF asserted that its president was Black, most of the nonprofits staff and volunteers were Black, and that it is a Black-led and Black community directed organization. (Doc. 35, Page 23). The APEDF has alleged all that is required from the *Ultimax* case which was cited by the District Court. It is even more erroneous that the District Court went outside the Amended Complaint to find anyone who worked or was on the website to not be Black, and asserted that "it only highlights this issue to show the difficulty in ascertaining the racial identities of corporations, particularly since Plaintiff has failed to provide sufficient factual allegations in its Amended Complaint to support its racial discrimination claim." (Doc. 56, page 12-13 n. 6). It is astonishing that there would be any confusion on the racial identity of this corporation, when the name of the non-profit is ***African*** People's Education and Defense Fund, Inc., the President is Black, most of the staff is Black, and the mission that APEDF has asserted on the application for the grant and throughout the Amended Complaint is "***to defend the human and civil rights of the African community and end the disparities faced by African people in health, healthcare, education and economic development.***" With all due respect, the racial context of the APEDF's Amended Complaint was undeniably clear.

38

An organization does not have to be 100% staffed or employed with the protected class in order to have a racial discriminatory claim. In fact *Ultimax* states that "a corporation owned by an African-American and staffed primarily with African-American employees, does have standing to assert a claim under Section 1981 based on racial discrimination directed at its owner and employees." *Id*. See, e.g., *John & Vincent Arduini Inc. v. NYNEX*, 129 F. Supp. 2d 162, 169 (N.D.N.Y.2001) (corporation owned by two Caucasian males has standing to assert a Section 1981 claim based on its allegation that it was denied a contract because the company promoted a Hispanic male to a supervisory position); *Rosales v. AT & T Info. Sys., Inc*., 702 F. Supp. 1489, 1495-1497 (D.Colo.1988) (corporation had standing to assert a Section 1981 claim based on its allegation that defendant denied its application for a dealership because it was owned by a Hispanic).

Notably, not only was it clear and well-pled that most of the members, staff and president are Black, that the APEDF's mission is to help the Black community, the Amended Complaint also showed that the Pinellas County Board of County Commissioners perceived the APEDF as "Black," and viewed the APEDF to be associated with other "Black" organizations, and discriminated against the APEDF for undeniably racially motivated characteristics, based on the organization's name, website, and the community they serve.

39

As shown in the text message dated February 7, 2023, Chris Latvala, a newly seated member of the Pinellas County Board of County Commissioners, sent Tyler Bonneau, Latvala's executive aid, screenshots of the list of grants approved and singled out APEDF stating, "Google the African Peoples one." (Doc. 35-6). Bonneau sends back a message that states "their website doesn't look so good." (Doc. 35-6). This clearly shows racial discrimination as a member of the Pinellas County Board of County Commissioners singled out the APEDF by their name and decided that he was going to "raise hell" by the look of APEDF's website. (Doc. 35-6). The APEDF was singled out from all the other approved applications, and was discriminated against based on APEDF's "mission to defend the human and civil rights of the African community and end the disparities faced by the African people in health, healthcare, education and economic development" as shown on their website and described in the grant applications. (Doc. 35-1, page 1). Further, on February 9, 2023, Latvala again asked Bonneau, through text messages, revealing a classic racist false preconception, "look to see if this African group is a hate group." (Doc. 35-7). Latvala then creates a plan to cover up his racial discrimination against APEDF, Latvala states,

> The Uhurus are claiming we are discriminating if we defund them. One of my questions yesterday was about political parties being eligible so we are going to use that
>
> …this ain't my first rodeo

40

(Doc. 35-7).

These messages show that race was a motivating factor to revoke APEDF's first grant and deny their second Application, and that the Defendant knew that this would be a racial discrimination, and the Defendant was searching for another basis to revoke the awarded grant. Further, racial discrimination has been shown through the APEDF's high rankings and first grant approval being revoked and their second grant denied, even though they were so highly ranked. Therefore, the APEDF has shown sufficient facts of race-based discrimination.

The APEDF also asserted sufficient facts to show successful grant applicants that were not Black. As stated in the Amended Complaint many of the successful grant applicants were predominantly white organizations that served predominantly white areas of Pinellas County in Clearwater, Largo, and Pinellas Park. (Doc. 35 at 25-28). The APEDF stated specific organizations that did not have Black leadership and who served predominantly white communities.

Specifically, the Amended Complaint stated,

The APEDF is the only organization whose funding was revoked after being awarded and the only organization recommended by PCF for funding that ultimately did not receive it.

Other nonprofit organizations who are not part of the protected class retained their ARPA awards, although their grant funding will also purchase "products and things" and provide a variety of services outside of food. Organizations who serve a predominantly white demographic, or whose mission is not explicitly in the service of the

41

protected group in question received preferential treatment. Examples include:

a. Gulf Coast Jewish Family and Community Services is a predominantly white organization and was awarded funding in two of the ARPA rounds, one for a new computer network system and one to renovate their building in Clearwater. This is not a "Black-led, and Black-Community Directed organization."

b. Tarpon Springs Shepherd Center serves the predominantly white North Pinellas County and got funding to purchase a refrigerated truck and conveyor belt. This is not a "Black-led, and Black- Community Directed organization."

c. Van Gogh's Palette provides services to members at its Vincent House located in the predominantly white Pinellas Park and received funding for computers. This is not a "Black-led, and Black-Community Directed organization."

d. Directions for Living provides mental health services from their locations in Clearwater and Largo, predominantly white areas of the county, and received funding for new furniture. This is not a "Black-led, and Black-Community Directed organization."

…

Many other applicants that were not part of the protected class failed to demonstrate how their projects would directly counteract the negative economic impact of COVID. Yet they received favorable treatment and were funded. Some of these are:

a. The Gulfport Historical Society maintains records of the white history of this town. In their application they attribute their financial woes equally to COVID closures and the weak seasonal support from the white "snowbird" population of Gulfport. Their direct COVID losses were minimal and their proposed purchases bore no direct relationship to counteracting such impact. This is not a "Black-led, and Black-Community Directed organization."

42

b. The Florida Dream Center serves the predominantly white communities of Lealman and Tarpon Springs. It received nearly $2M - twice its annual budget - in ARPA funding from Pinellas County to purchase its headquarters building plus $150,000 for a refrigerated truck and a forklift. This level of funding, in relation to its annual budget, far exceeds a remedy for economic losses due to COVID. This is not a "Black-led, and Black-Community Directed organization."

c. Remember Me, NFP is a Largo-based suicide prevention program offering water therapy on Pinellas County beaches. With no Black leadership and not serving residents within a Qualified Census Tracts, it is a predominantly white organization. It was incorporated in 2021 when the COVID pandemic was well underway and received ARPA funding amounting to 4 times its annual budget to buy a van. This is not a "Black-led, and Black- Community Directed organization."

(Doc. 35, pages 25-28).

On June 13, 2023, the Commissioners voted to fund ALL of the applicants on the original recommendation list, EXCEPT the APEDF. (Doc. 35, page 28). It is clear from the Amended Complaint that the APEDF adequately alleged that the APEDF's leadership was Black and their mission is to serve the Black community. The APEDF also clearly established that other similarly situated non-profits who did not have black leadership and did not have a "mission" to serve the Black community, received their grants.

The District Court erroneously concluded that the "comparators appear … to maintain striking dissimilarities from the Plaintiff" including the type of funding requested by APEDF. (Doc. 56, page 13). The APEDF requested radio equipment and generator, which is not so dissimilar from a refrigerated truck, forklift, new

computer system to renovate a building, or new furniture, as requested by the comparators. Additionally, the APEDF did not request any more money and did not exceed an annual budget as compared to the comparators. It should also be noted that the APEDF's application was ranked 4th out of all the applications for the type of funding requested including the impact on residents by expanding access to food, housing, education, and healthcare. The APEDF's type of funding was *exactly* what ARPA was designed to help, however, the APEDF was the only non-profit that Pinellas County decided to revoke funding from. The "comparators," and all necessary elements to support a properly pled cause of action on this type of discrimination was sufficiently set forth in the Amended Complaint.

## CONCLUSION

This Court should REVERSE the District Court's Order granting Pinellas County's Motion to Dismiss APEDF's Amended Complaint with Prejudice. As established by the points and authorities specified above, it is respectfully submitted that APEDF properly set forth all necessary elements to support the allegations in the Amended Complaint that Pinellas County (1) violated APEDF's rights by revoking and denying the relevant ARPA grants on the basis of APEDF's associations with the "Uhuru Movement," violation APEDF's First Amendment rights to "freedom of association," (2) violated APEDF's Due Process rights by rescinding the previously approved ARPA grant with no notice or any opportunity

44

to be heard, (3) violated APEDF's right to equal protection based on the County's racially discriminatory conduct. This Court is requested to confirm that the First Amended Complaint is proper in all respects and the case should be allowed to go forward. In the alternative if there is any concern about the allegations in the Amended Complaint supporting the above referenced causes of action, it is respectfully requested that APEDF be allowed to amend the Operative Complaint to address any such concerns, without being deprived of access to the courts through the operative fatal rejection of APEDF's rights as articulated by the District Court in granting Dismissal of the Amended Complaint with Prejudice.

Date: January 8, 2025.                    Respectfully submitted,

                                          /s/ Luke Lirot
                                          Luke Lirot, Esq.
                                          LUKE CHARLES LIROT, P.A.
                                          Florida Bar Number 714836
                                          2240 Belleair Road, Suite 190
                                          Clearwater, Florida 33764
                                          (727) 536-2100
                                          Luke2@lirotlaw.com
                                          team@lirotlaw.com
                                          *Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS AND TYPE-STYLE REQUIREMENTS

This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because it contains 10,798 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 8, 2025, I electronically filed the forgoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all parties in this case.

/s/ Luke Lirot
Luke Lirot, Esq.
*Counsel for Appellant*

46